UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK STEINES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CROWN MEDIA UNITED STATES, LLC, et al., <br><br> Defendants. | Case No.: CV 18-09293-CJC(FFMx) <br><br><br> ORDER GRANTING DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL [Dkt. 25] AND GRANTING IN PART DEFENDANTS' MOTION TO SEAL [Dkt. 23] |

I.  INTRODUCTION

This case arises out of the termination of Mark Steines, the former co-host of the Hallmark Channel's television show "Home & Family," after Steines allegedly reported sexual harassment by an executive producer on the show.  Plaintiffs Mark Steines and Steines Entertainment, Inc. assert claims against Defendants Crown Media United States,

1   LLC, Crown Media Holdings, Inc., and Citi Teevee, LLC.  (Dkt. 1-2 [First Amended

2   Complaint, hereinafter "FAC"].)

3

4       Before Plaintiffs brought this case, Plaintiffs' counsel entered into a legal

5   consulting agreement with an executive producer and production company associated

6   with Home & Family.  Defendants were third-party beneficiaries to this agreement,

7   which expressly created an attorney-client relationship between Defendant Crown Media

8   United States, LLC and Plaintiffs' counsel, The Bloom Firm.  Defendants now move to

9   disqualify Plaintiffs' counsel.  (Dkt. 25 [hereinafter "Mot."].)  For the following reasons,

10  the motion to disqualify is **GRANTED**.

11

12  **II.  BACKGROUND**

13

14      The controversy here concerns the cast and crew of Hallmark Channel's Home &

15  Family, a daytime, family-oriented lifestyle show that airs weekdays on the Hallmark

16  Channel.  (FAC ¶ 1.)  Despite the show's squeaky-clean portrayal on television, it was

17  apparently another case behind the scenes.  The show's creator and longtime executive

18  producer, Forrest "Woody" Fraser, allegedly bullied, verbally abused, and harassed cast

19  and crew members, particularly female producers.  (*Id.* ¶¶ 20–21.)  In the spring of 2017,

20  two female employees at Home & Family formally reported claims of sexual harassment

21  involving Fraser.  (*Id.* ¶ 35.)  The Bloom Firm and Lisa Bloom, who are now Plaintiffs'

22  counsel in this case, represented the female employees.  (*Id.*)  The parties apparently

23  settled these claims.

24

25      Around the same time, in July 2017, The Bloom Firm entered into a "Legal

26  Consulting Agreement" ("LCA") with Woody Fraser and Woody Fraser Enterprises, Inc.

27

28

1  (collectively, "the Fraser Parties").[1]  (Dkt. 25-2 Ex. A [Legal Consulting Agreement,

2  hereinafter "LCA"].)  The LCA designated Crown Media United States, LLC as a third

3  party beneficiary.  (*Id.* ¶ 11.) The contract was to last for a period of three years, from

4  July 2017 to July 2020.  (*Id.* ¶ 2.)

5

6        The LCA defined a broad scope of services to be provided by The Bloom Firm.

7  Under the LCA, The Bloom Firm agreed to "advise regarding legal situations in

8  television and movie productions," which the LCA defined as "Legal Consulting."  (*Id.*

9  ¶ 3.)  Either the Fraser Parties or Crown Media United States, LLC, and its affiliated

10  companies could request these services on "an as needed basis."  (*Id.*)  The Bloom Firm

11  agreed to provide a maximum of five hours of services each year.  (*Id.*)  The relationship

12  created under the LCA, however, was ongoing.  The Bloom Firm agreed "to be engaged

13  and continuously retained by the Fraser Parties" for the duration of the LCA and "to

14  perform such Legal Consulting and if reasonably requested from time to time by the

15  Fraser Parties."  (*Id.*)

16

17        The LCA also expressly created an attorney-client relationship between attorneys

18  at The Bloom Firm and Crown Media United States, LLC.  The LCA states:

19

> The Bloom Firm hereby acknowledges and agrees that this Agreement
20    creates an attorney-client relationship for the term of the Agreement between
   the [sic] Bloom Firm, including all attorneys of The Bloom Firm (including
21    Lisa Bloom, Alyson Decker, and Vanessa Hooker), on one hand, and the
22    Fraser Parties, including any of their respective affiliates or related entities,
   and Crown Media United States, LLC, including any of its affiliated or
23    related entities ("Crown Companies"), on the other hand.

24

25  (*Id.* ¶ 6.)  Under the LCA, The Bloom Firm agreed "not to solicit and/or refer, directly or

26  indirectly, any person to legal counsel who is seeking to bring or file a lawsuit, charge,

27

---

28  [1] Defendants filed an unredacted version of the LCA under seal.  However, Defendants stated they were
willing to waive attorney-client privilege as to the LCA.  (*See* Mot. at 5 n.6.)

1    and/or legal claim of any nature against the Fraser Parties for a period of three (3) years."

2    (*Id.* ¶ 7.)  The non-solicitation clause included an exception for the two female employees

3    whom The Bloom Firm had represented for their sexual harassment claims.  (*Id.*)

4

5         In exchange for these services, the Fraser Parties agreed to pay The Bloom Firm a

6    total of $50,000 in three annual installments.  (*Id.* ¶ 5.)  The first installment payment was

7    $16,666.666, which the Fraser Parties paid to The Bloom Firm in September 2017.  (*Id.*;

8    Dkt. 31-1 [Declaration of Lisa Bloom, hereinafter "Bloom Decl."] ¶ 14.)  The second

9    installment payment was due on June 30, 2018.  (LCA ¶ 5.)

10

11        Over the next year, Defendants and the Fraser Parties did not contact The Bloom

12    Firm.  (Bloom Decl. ¶¶ 15–17.)  On June 13, 2018, Lisa Bloom sent a letter in which she

13    unilaterally terminated the LCA.  (*Id.* ¶ 21.)  She returned the first installment payment

14    and asked the Fraser Parties not to send the second installment payment.  (*Id.* ¶¶ 21, 29.)

15    Bloom contended the LCA was a sham and violated California Rule of Professional

16    Conduct 1-500.  (*Id.* ¶¶ 19–22.)  On June 29, 2018, Defendants' counsel responded that

17    they intended to use The Bloom Firm's "legal services" under the LCA.  (*Id.* ¶ 23.)  On

18    July 6, 2018, counsel for the Fraser Parties also responded that his clients continued to

19    view the LCA as binding and enforceable.  (Dkt. 25-2 [Declaration of Howard M. Knee]

20    ¶ 12.)

21

22        Shortly thereafter, on July 23, 2018, The Bloom Firm sent a demand letter to

23    Defendants on behalf of the Plaintiffs in this case.  (Bloom Decl. ¶ 33; Dkt. 25-1

24    [Declaration of Michael Wertheim] ¶ 5.)  Defendants responded that The Bloom Firm

25    still had ethical obligations to Defendants under the LCA and informed Plaintiffs that

26    they would seek disqualification of The Bloom Firm based on the conflict of interest.

27    (*Id.* ¶ 6.)  Defendants' motion to disqualify is now before the Court.

28

1   **III.  MOTION TO DISQUALIFY**

2

3       "The authority of a trial court to disqualify an attorney derives from the power

4   inherent in every court [t]o control in furtherance of justice, the conduct of its ministerial

5   officers." *City & Cty. of S.F. v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 846 (2006) (citation

6   and internal quotation marks omitted); *see also United States v. Wunsch*, 84 F.3d 1110,

7   1114 (9th Cir. 1996).  In deciding whether to disqualify an attorney, "the paramount

8   concern must be the preservation of public trust both in the scrupulous administration of

9   justice and in the integrity of the bar."  *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72

10  Cal. App. 4th 1422, 1428 (1999).  State law is applied in making such a determination.

11  *In re Cty. of L.A.*, 223 F.3d 990, 995 (9th Cir. 2000).  The district court must make

12  findings supported by substantial evidence.  *People ex rel. Dep't of Corps. v. SpeeDee*

13  *Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1143 (1999).  The Court first evaluates whether

14  there was an attorney-relationship between The Bloom Firm and Defendants.  It then

15  considers whether this relationship justifies The Bloom Firm's disqualification.

16

17       **A.      Attorney-Client Relationship**

18

19       As a threshold matter, the parties dispute whether there was an attorney-client

20  relationship between The Bloom Firm and Defendants.  An attorney's duty to her client

21  depends on the existence of an attorney-client relationship. *Nichols v. Keller*, 15 Cal.

22  App. 4th 1672, 1684 (1993).  In the absence of such a relationship, there is no fiduciary

23  duty. *Id.*  Generally, "the attorney-client relationship is created by some form of contract,

24  express or implied, formal or informal." *Id.*

25

26       By its terms, the LCA creates an attorney-client relationship between The Bloom

27  Firm and Defendants.  In paragraph 6 of the LCA, The Bloom Firm explicitly

28  "acknowledge[d] and agree[d]" to enter into an attorney-client relationship with

1    Defendant Crown Media United States, LLC, and its affiliated and related entities.  (LCA

2    ¶ 6.)  The rest of the LCA repeatedly refers to the "Legal Consulting" services that The

3    Bloom Firm would provide.  Paragraph 3 of the LCA states "The Bloom Firm shall

4    advise regarding *legal* situations in television and movie productions."  (*Id.* ¶ 3 [emphasis

5    added].)  This language clearly creates an attorney-client relationship.

6

7          The Bloom Firm refers to paragraph 6 as a "sham provision" and asks the Court to

8    look to the rest of the LCA, which it claims does not create an attorney-client

9    relationship.  (Dkt. 31 [Opposition, hereinafter "Opp'n"] at 13.)  The Bloom Firm

10   contends this Court should insert the word "fictional" into paragraph 3 and asserts the

11   firm intended to provide *non-legal* advice regarding legal situations in *fictional* television

12   and movie productions, such as reviewing scripts for whether a courtroom scene is

13   realistic.  The Bloom Firm argues Defendants interpreted the LCA in this way.  On June

14   29, 2018, after The Bloom Firm terminated the LCA, Defendants' counsel stated that

15   Defendants had intended to use The Bloom Firm's legal services under the LCA, adding

16   that "[i]n fact, Crown Media has been developing content for which it expects to get the

17   benefit of your review and expertise."  (Bloom Decl. ¶ 23.)  On July 30, 2018, after

18   Plaintiffs sent the demand letter, Defendants' counsel told The Bloom Firm that "[t]he

19   timing of your letter is curious; Crown Media was about to send you a script to review,

20   pursuant to the [LCA]."  (*Id.* ¶ 34.)  The Bloom Firm claims Defendants' conduct

21   supports its interpretation.

22

23         But The Bloom Firm cannot now rewrite the terms of the LCA.  The LCA is not

24   limited to reviewing scripts or advising on the accuracy of fictional courtroom scenes.  It

25   broadly states that The Bloom Firm will advise on "legal situations."  (*See* LCA ¶ 3.)

26   This language—coupled with the fact that another paragraph in the LCA expressly

27   creates an attorney-client relationship—indicates that the Fraser Parties and Defendants

28   hired The Bloom Firm to provide legal advice.  In fact, paragraph 7 specifically preserved

1  the firm's ability to continue to represent the two female employees in their sexual

2  harassment claims.  (*Id.*)  Moreover, the California Rules of Professional Conduct

3  allocate any decisions regarding the objectives of representation to the client.  *See* Cal.

4  Rules of Prof'l Conduct r. 1.2(a).  Although a lawyer may place reasonable limitations on

5  the scope of representation, the client must provide informed consent.  *Id.* r. 1.2(b).  The

6  LCA's only limit was to "legal situations in television and movie productions."  (LCA

7  ¶ 3.)  It was Defendants' prerogative to utilize The Bloom Firm's services as they wished.

8

9          The Bloom Firm also argues the LCA is unenforceable because it violates

10  California Rule of Professional Conduct 5.6[2] and California Business and Professions

11  Code § 16600.  (Opp'n at 6–13.)  Rule 5.6 prohibits a lawyer from participating in

12  offering or making "an agreement that imposes a restriction on a lawyer's right to

13  practice in connection with a settlement of a client controversy, or otherwise."  Cal. Rules

14  of Prof'l Conduct r. 5.6(a).  Section 16600 voids contracts which purport to restrain an

15  individual from engaging in a lawful profession, trade, or business.  Cal. Bus. & Prof.

16  § 16600.  The Bloom Firm contends that the LCA, particularly paragraph 7's covenant

17  not to solicit or refer parties to legal counsel, is an impermissible restraint on its ability to

18  practice law.  The Court disagrees.

19

20          The LCA is an agreement to *engage* in the practice of law on behalf of the Fraser

21  Parties and Defendants.  The LCA itself does not indicate that its execution was a

22  condition of settlement for the sexual harassment claims asserted by the two female

23  employees.  The supposed "restrictions" are the kind of restrictions mandated by the

24  California Rules of Professional Conduct.  In paragraph 7, The Bloom Firm "agree[d] not

25  to solicit and/or refer, directly or indirectly, any person to legal counsel who is seeking to

26  bring or file a lawsuit, charge, and/or legal claim of any nature against the Fraser Parties"

27

28  [2] In its brief, The Bloom Firm refers to California Rule of Professional Conduct 1-500.  Since November 1, 2018, former Rule 1-500 is now Rule 5.6.

1    for the period of the agreement.  (LCA ¶ 7.)  This covenant parallels an attorney's ethical

2    obligations to not represent a client if the representation is directly adverse to another

3    client.  *See* Cal. Rules of Prof'l Conduct r. 1.7(a).

4

5         The Court acknowledges that the LCA may achieve a similar effect to an

6    agreement prohibited by Rule 5.6, even if it technically does not violate the rule.  The

7    California Rules of Professional Conduct, however, permit a person to hire a lawyer who

8    previously represented an adverse party, so long as the lawyer obtains informed written

9    consent.  *Id.* r. 1.9(a).  Commentators have interpreted ABA Model Rule 5.6, on which

10   California modeled its own Rule 5.6, to allow a defendant to "retain the plaintiff's

11   lawyer, after the settlement, as consulting counsel on any claims arising out of the same

12   transaction.  By operation of the conflict of interest rules, that arrangement would

13   preclude the lawyer from representing any new plaintiffs in such cases."  Geoffrey C.

14   Hazard, Jr. & W. William Hodes, 2 The Law of Lawyering § 5:6:301 (Supp. 1997).

15

16        Moreover, even if Defendants' counsel and The Bloom Firm violated Rule 5.6 by

17   entering into the LCA, the Court still cannot allow The Bloom Firm to represent

18   Plaintiffs and get out of its obligations to Defendants because of The Bloom Firm's own

19   *earlier* ethical violation.  A lawyer's word is her bond and The Bloom Firm promised

20   Defendants it would represent them and not others adverse to their interests.  This

21   conduct alone creates the appearance of impropriety, implicates conflicting interests, and

22   justifies The Bloom Firm's disqualification from this case.  *See Goldstein v. Lees*, 46 Cal.

23   App. 3d 614, 620 (1975) ("It is better to remain on safe and secure professional ground,

24   to the end that the ancient and honored profession of the law and its representatives may

25   not be brought into dispute.  Courts have consistently held the members of the profession

26   to the strictest account in matters affecting the relation of attorney and client." (quoting

27   *Tomblin v. Hill*, 206 Cal. 689, 694 (1929))).

28

1    The Bloom Firm also argues the LCA is "contradictory" and "a sham intended to

2    fraudulently conflict The Bloom Firm out of representing employees against Defendants"

3    because a true attorney-client agreement would not contain non-solicitation and non-

4    referral clauses and would not designate third party beneficiaries.  (Opp'n at 11–12.)  The

5    Bloom Firm asserts the LCA lacks features typically found in retainer agreements, such

6    as attorneys' hourly rates, a joint representation agreement, a confidentiality waiver, and

7    a potential conflict waiver for the different beneficiaries.  (*Id.* at 12.)  The Bloom Firm

8    also relies heavily on the fact that it purportedly did not draft the LCA.  (*Id.*)

9

10    The Bloom Firm, however, cannot escape the LCA's plain and clear wording.  The

11    LCA is a binding agreement.  The Bloom Firm entered into the agreement freely, without

12    coercion or duress.  Its attorneys agreed to provide fifteen hours of services for a total

13    sum of $50,000.  (*See* LCA ¶¶ 3, 5.)  The Bloom Firm may now be unhappy with the

14    consequences of that agreement.  But the Court cannot undo that deal or rewrite its

15    terms.[3]

16

17    ───────────────────

18    [3] The Bloom Firm asks the Court to take judicial notice of (1) the number of Hallmark Channel
     Christmas movies in 2017 and 2018, (2) a statement from Crown Media Family Networks on its

19    website, (3) a complaint from another lawsuit brought by the lead chef on Home & Family against
     Crown Media United States, LLC, and (4) California State Bar Formal Opinion No. 1999-154.  (Dkt.

20    32.)  Since these documents are the proper subject of judicial notice, *see* Fed. R. Evid. 201(b), the
     request is GRANTED.  Based in part on these documents, The Bloom Firm argues that there was no

21    attorney-client relationship based on how the parties acted.  (Opp'n at 16–17.)  First, The Bloom Firm
     argues that only Defendants believed there was an attorney-client relationship.  A putative client's

22    subjective belief that an attorney-client relationship exists cannot, standing alone, create such a
     relationship or establish a duty of care owed by the attorney.  *Zenith Ins. Co. v. O'Connor*, 148 Cal.

23    App. 4th 998, 1010 (2007).  Here, the Court does not rely on Defendants' subjective belief, but on the
     plain language in the LCA.  Second, The Bloom Firm argues there was no attorney-client relationship

24    because Defendants did not contact the firm after signing the LCA.  The Court is unpersuaded.  An
     attorney-client relationship does not terminate simply because a firm has not performed work for the

25    client for some time.  *See Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 82
     (2018).  Defendants did not use The Bloom Firm's legal services in the first year, but the LCA was

26    supposed to last for three years.  Lastly, The Bloom Firm claims the LCA was a "sham agreement"
     because Defendants did not consult them regarding the termination of two employees on Home &

27    Family.  (Opp'n at 19–20.)  But Defendants' decision to not consult The Bloom Firm on a particular

28    matter does not foreclose the existence of an attorney-client relationship.  The California Rules of

**B.      Duties of Loyalty and Confidentiality**

As Defendants' attorneys, The Bloom Firm owed and continues to owe duties of loyalty and confidentiality.  These duties are essential to the maintenance of the attorney-client relationship.  According to the California Supreme Court, "[o]ne of the principal obligations which bind an attorney is that of fidelity, the maintaining inviolate the confidence reposed in him by those who employ him, and at every peril to himself to preserve the secrets of his client. . . . By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests." *Flatt v. Superior Court*, 9 Cal. 4th 275, 289 (1994) (quoting *Anderson v. Eaton*, 211 Cal. 113, 116 (1930)).

An attorney owes duties of loyalty and confidentiality to both current and former clients.  With respect to current clients, an attorney may not represent another client if the representation is adverse to a current client in the same or a separate matter.  Cal. Rules of Prof'l Conduct r. 1.7(a), (b).  Absent informed written consent, a lawyer is automatically disqualified from acting as an advocate in one matter against a person the lawyer represents in the same or another matter, even if the matters are wholly unrelated. *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 84 (2018); *Flatt*, 9 Cal. 4th at 285.

Defendants argue the Court must automatically disqualify The Bloom Firm because The Bloom Firm took adverse action against current clients.  (Mot. at 7–10.) Defendants claim the timeline suggests The Bloom Firm sought to represent Plaintiffs before Lisa Bloom withdrew from the LCA.  (*Id.* at 8.)  The timeline is suspicious: on May 30, 2018, Steines was removed as co-host of Home & Family, (FAC ¶ 50); on June

---

Professional Conduct specifically allocate decisions over the scope of representation to the client. *See* Cal. Rules of Prof'l Conduct r. 1.2.

13, 2018, Lisa Bloom sent a letter purporting to unilaterally withdraw from the LCA, (Bloom Decl. ¶ 21); and on July 23, 2018, The Bloom Firm sent a demand letter to Defendants on behalf of Plaintiffs, (*id.* ¶ 23).  Indeed, The Bloom Firm has not asserted that it sought to represent Plaintiffs only *after* withdrawing from the LCA.[4]

The fact that The Bloom Firm later withdrew from the LCA does not prevent the firm's automatic disqualification from this case.  "[U]nder the 'hot potato' doctrine, a lawyer cannot avoid California's automatic disqualification rule 'by unilaterally converting a present client into a former client prior to hearing on the motion for disqualification.'"  *Netlist, Inc. v. SK Hynix Inc.*, 2016 WL 8905079, at *3 (C.D. Cal. Dec. 5, 2016) (quoting *Flatt*, 9 Cal. 4th at 288); *see also Truck Ins. Exch. v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1055–56 (1992) (applying automatic disqualification rule to attorney that concurrently represented clients whose interests conflicted, even when the attorney had later withdrawn representation).

Moreover, even if Defendants were The Bloom Firm's former clients when The Bloom Firm began representing Plaitniffs, The Bloom Firm still owed a continuing duty of loyalty. Without informed written consent, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."  Cal. Rules of Prof'l Conduct r. 1.9(a).  In such circumstances, disqualification is warranted where the former client can show the subjects of the successive representations are "substantially related."  *Khani v. Ford Motor Co.*, 215 Cal. App. 4th 916, 920 (2013).

---

[4] When directly asked at the hearing, Lisa Bloom asserted attorney-client privilege and declined to state when she first communicated with Plaintiffs about brining claims against Defendants.

A successive representation is "substantially related" if "the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 713 (2003).  General knowledge of the client's dealings—a "playbook approach"—will not suffice to show a substantial relationship.  *Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 680 (2004). Rather, the substantial relationship test requires that "the information acquired during the first representation be 'material' to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation."  *Id.* (citing *Jessen*, 111 Cal. App. 4th at 712–13).

Where a substantial relationship is established, "access to confidential information by the attorney in the course of the first representation . . . is *presumed* and disqualification of the attorney's representation of the second client is mandatory."  *Flatt*, 9 Cal. 4th at 283.  A court can vicariously extend that disqualification to the disqualified attorney's entire firm.  *See Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 809 (2010); *see also SpeeDee*, 20 Cal. 4th at 1139 ("When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm.").

Defendants have demonstrated that disqualification is warranted based on the substantial relationship test.  The LCA defined the scope of services to include "legal situations in television and movie productions," at the request of the Fraser Parties and Crown Media United States, LLC.  (LCA ¶ 3.)  The language is broad, conceivably including legal situations from copyright to tort.  It also encompasses employment issues, like discrimination and harassment claims, on which The Bloom Firm has particular

expertise.  (*See* Bloom Decl. ¶ 5.)  The lawsuit here involves a legal situation—an employment dispute—in a television production, namely Steines' termination from Home & Family.  Accordingly, the matters are substantially related, so The Bloom Firm's access to confidential information is presumed.  *See Flatt*, 9 Cal. 4th at 283.

The Bloom Firm claims that it did not obtain any confidential information that would justify the firm's disqualification.  (Opp'n at 21–24.)  In particular, it claims it learned any confidential information not during the professional relationship but *before* the parties entered into the LCA.  (*Id.*)  Whether The Bloom Firm actually received confidential information, however, is not at issue.  California courts "have recognized the dangers of the swearing matches that would result if they required proof of *actual* knowledge of material confidential information," as it would "tear[] aside the protective cloak drawn about the lawyer-client relationship."  *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1388 (N.D. Cal. 1992).  Where there is a substantial relationship between the two representations, actual possession of confidential information is not required for an order of disqualification.  *Civil Serv. Comm'n v. Superior Court*, 163 Cal. App. 3d 70, 80 (1984) ("[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action [where] the attorney previously represented him, the former client." (internal quotation marks and citation omitted)).   Since there is a substantial relationship between the two representations, the Court is convinced that it must disqualify The Bloom Firm.

## C.     Prejudice to Plaintiffs

A court may still deny a motion to disqualify if the movant unreasonably delayed in seeking disqualification, causing its opponent significant prejudice.  *River West, Inc. v. Nickel*, 188 Cal. App. 3d 1297, 1309 (1987).  Here, there has been minimal, if any, delay.

1    Defendants immediately raised the conflict of interest in response to Plaintiffs' demand

2    letter.  They then filed this motion the day after the Court denied Plaintiffs' motion to

3    remand and Defendants' motions to dismiss and strike.  (*See* Dkts. 22, 25.)  This case was

4    filed on September 20, 2018, and remains in its early stages, so Plaintiffs will not be

5    unduly prejudiced if they are required to find new counsel.  Accordingly, Defendants'

6    motion to disqualify is **GRANTED**.[5]

7

8    **IV.  MOTION TO SEAL**

9

10   Defendants have also filed an application for leave to file under seal portions of

11   declarations and exhibits in support of their motion to disqualify.  (Dkt. 23.)  A party

12   seeking to file documents under seal bears the burden of overcoming the presumption in

13   favor of public access to court records.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809

14   F.3d 1092, 1096 (9th Cir.), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*,

15   137 S. Ct. 38 (2016).  "The presumption of access is 'based on the need for federal

16   courts, although independent—indeed, particularly because they are independent—to

17   have a measure of accountability and for the public to have confidence in the

18   administration of justice.'"  *Id.*

19

20   To file under seal documents attached to non-dispositive motions, the party must

21   show "good cause."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1180 (9th

22   Cir. 2006).  "For good cause to exist, the party seeking protection bears the burden of

23   showing specific prejudice or harm will result if no protective order is granted."  *Phillips*

24   *ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002).  If

25   a court finds particularized harm will result from public disclosure of the information, it

26

27   [5] Plaintiffs make a number of evidentiary objections to the declarations submitted by Defendants.  (Dkts. 28, 40.)  These objections are well taken, particularly regarding the lack of foundation and personal

28   knowledge for certain assertions in the Declaration of Deanne Stedem.  Accordingly, the Court does not rely on these declarations, but only on the LCA and Bloom Declaration.

1   then balances the public and private interests to decide whether a protective order is

2   necessary.  *Id.*

3

4          Defendants seek to file the following under seal: (1) paragraphs 5, 6, and 14 of the

5   Declaration of Howard M. Knee ("Knee Declaration"), (2) the substantive terms of the

6   LCA, (3) the amount of the First Installment Check, and (4) paragraphs 6, 19, and 20 and

7   portions of paragraph 21 of the Declaration of Deanne R. Stedem ("Stedem

8   Declaration").  Defendants assert these documents contain confidential information that

9   is protected by attorney-client privilege, protected by mediation privilege, and subject to

10  confidentiality agreements.  Defendants also argue these portions contain sensitive and

11  confidential business information and private information of non-parties.  Plaintiffs agree

12  that paragraph 19 of the Stedem Declaration and paragraph 7 of the LCA should be

13  sealed to protect the privacy interests of non-parties.  (Dkt. 29 [Opposition] at 1.)  They

14  also seek to seal the first paragraph of Lisa Bloom's letter dated June 13, 2018 for the

15  same reason.  (*Id.*)  Plaintiffs contest whether the rest of the documents should be sealed.

16  (*Id.*)

17

18         The Court finds there is good cause to seal some of the proposed documents.  The

19  Court **GRANTS** Defendants' request to file under seal paragraph 19 of the Stedem

20  Declaration and the second sentence of paragraph 7 of the LCA, because these portions

21  mention the names of the two female employees who filed sexual harassment claims

22  against Fraser.  These women have strong privacy interests and the public has a limited

23  interest in their identities, particularly since they are not parties to this case.  The Court

24  seals the first paragraph in Lisa Bloom's June 13, 2018 letter for the same reason.  In

25  addition, the Court **GRANTS** Defendants' request to file under seal paragraphs 5, 6, and

26  14 of the Knee Declaration and paragraphs 6 and 20 and portions of paragraph 21 of the

27  Stedem Declaration.  These paragraphs refer to information subject to attorney-client

28

1   privilege and mediation privilege.  They also involve sensitive business information.  The

2   public has a limited interest in this information.

3

4   The Court **DENIES** Defendants' request to file the remaining documents under

5   seal.  Except for the second sentence of paragraph 7, the rest of the LCA should not be

6   filed under seal.  Defendants have waived any attorney-client privilege in this document

7   and there is a strong public interest in disclosing why the Court has disqualified The

8   Bloom Firm.  The Court also denies Defendants' request to file the First Installment

9   Check under seal.  The First Installment Check merely reflects the amount of money paid

10  in a single transaction and does not indicate information that comes within the scope of

11  attorney-client privilege.  *See L.A. Cty. Bd. of Supervisors v. Superior Court*, 2 Cal. 5th

12  282, 297 (2016) (finding that "the amount of money paid for legal services is generally

13  not privileged," even though certain information in billing invoices, such as an uptick in

14  spending or information on the nature or amount of work, may be).  This information

15  should be public.

16

17

18  //

19

20

21

22

23

24

25

26

27

28

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to disqualify Plaintiffs' counsel is **GRANTED**.  Defendants' application for leave to file under seal is **GRANTED IN PART**.

**IT IS HEREBY ORDERED** that the designated portions of the following documents should be sealed and that counsel for Defendants may file the following under seal:

| Title of Document | Portion to Be Sealed |
|---|---|
| Declaration of Howard M. Knee in Support of Defendants' Motion to Disqualify | Paragraphs 5, 6, and 14. |
| Legal Consulting Agreement, Exhibit A, to the Declaration of Howard M. Knee in Support of Defendants' Motion to Disqualify | The second sentence in paragraph 7, which begins "Nothing in this agreement . . ." |
| Declaration of Deanne R. Stedem in Support of Defendants' Motion to Disqualify | Paragraphs 6, 19, 20 and portions of paragraph 21 (specifically as highlighted at page 6, lines 18–20). |
| Letter from Lisa Bloom dated June 13, 2018, Exhibit A, to the Declaration of Deanne R. Stedem | The first paragraph in the letter's body, which begins "As you know . . ." |

**IT IS FURTHER ORDERED** that Docket No. 24 will remain under seal.  Docket No. 25-3 shall be sealed.  Defendants shall file **WITHIN SEVEN DAYS**: (1) a new redacted version of the LCA, (2) a new redacted version of the Stedem Declaration and exhibits, redacting the first paragraph in the June 13, 2018 letter from Lisa Bloom, and (3) an unredacted version of the First Installment Check.  Once Plaintiffs obtain new counsel, the parties are directed to meet-and-confer regarding the briefing schedule and

hearing date on Plaintiffs' pending motions to dismiss and strike, which are currently

scheduled for hearing on February 11, 2019.

DATED:      January 16, 2019

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE